UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

PATRICIA L. ENGLE            )
                            )
            Plaintiff,       )
                            )
        v.                  ) Cause No.: 1:13-cv-339
                            )
CAROLYN W. COLVIN,          )
Acting Commissioner of SSA, )
                            )
            Defendant.       )

OPINION AND ORDER

This matter is before the court on the petition for review of the decision of the

Commissioner of the Social Security Administration filed by the plaintiff, Patricia L. Engle, on

November 26, 2013. For the following reasons, the decision of the Commissioner is

**AFFIRMED**.

*Background*

The plaintiff, Patricia L. Engle, filed an application for Disability Insurance Benefits

alleging a disability as of January 21, 2011. (Tr. 124–25). Her application was denied on initial

consideration and reconsideration. (Tr. 65–68, 70–72). Engle requested a hearing, and a hearing

was held before an Administrative Law Judge, Steven Neary, on May 17, 2012. (Tr. 36–56).

Engle appeared with counsel, and the ALJ heard testimony from Engle, her husband, and an

impartial vocational expert. (Tr. 36). On June 13, 2013, the ALJ issued his decision finding that

Engle was not disabled at step two of the sequential evaluation process because she did not have

any severe impairments. In September 2013, the Appeals Council denied Engle's request for

review, making the ALJ's decision the final decision of the Commissioner. Engle now appeals the Commissioner's decision to this court.

At step one of the five step sequential analysis for determining whether a claimant is disabled, the ALJ determined that Engle had not engaged in substantial gainful activity since January 21, 2011, her alleged onset date. (Tr. 26). At step two, the ALJ concluded that Engle did not have an impairment or combination of impairments that significantly limited her ability to perform basic work-related activities. (Tr. 26). In reaching that conclusion, the ALJ first summarized Engle's testimony. (Tr. 27). He noted that Engle testified that she had difficulty focusing and concentrating, suffered from constant pain that felt like muscle spasms in her back, hips, legs, and feet, and had two to five panic attacks per month that lasted for two hours to several days. (Tr. 27). Her medications made her sleepy for three to four hours after taking them, activity worsened her symptoms, and she was able to walk just half a block before her feet hurt and she became short of breath. (Tr. 27). She was able to stand for one hour before her legs hurt, only could lift five pounds, and had difficulty sleeping at night. (Tr. 27). Engle further testified that she rested for two to four hours a day, did not bathe on a daily basis, and sometimes stayed in her pajamas. (Tr. 27). The ALJ also noted that Engle's husband testified that she had withdrawn from others and got lost easily when driving. (Tr. 27).

The ALJ then summarized the impairments Engle identified. (Tr. 27). She stated that she had bipolar disorder, was depressed, and became confused at times. (Tr. 27). She had to rest in between doing loads of laundry, slept twelve to fourteen hours per day, her heart rate was fast, and she had a spastic colon. (Tr. 27). She further stated that she was falling apart, experienced episodes of vomiting, had experienced two heart attacks, sometimes shook all over during the entire day, was easily exhausted, and had trouble breathing, reaching overhead, and climbing

stairs. (Tr. 27). She reported that she was much quieter than she used to be, sometimes had blurry vision, preferred to be alone, had difficulty handling stress and changes in routine, and needed reminders to care for her personal needs. (Tr. 27).

Prior to the hearing, Engle's sister, Pamela Sullivan, alleged that Engle wanted to stay home, had difficulty sleeping, did not care for her personal needs on a regular basis, and needed reminders to take her medications. (Tr. 27). Engle suffered from chest pain and shortness of breath and sometimes had panic attacks and paranoid thoughts. (Tr. 27). She also stated that Engle had difficulty lifting, standing, reaching, walking, climbing stairs, following instructions, concentrating, and handling stress and changes in routine. (Tr. 28).

The ALJ then stated that, considering the record as a whole, he found Engle's "medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the statements made by the claimant and Ms. Sullivan concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent they are inconsistent with a finding that the claimant has no severe impairment or combination of impairments for the reasons explained below." (Tr. 28).

The ALJ first explained that the evidence did not support a finding that Engle had severe impairments for twelve months. (Tr. 28). Engle was able to shop for groceries and pay bills at times, leave her home unaccompanied by other adults, do some reading, use a telephone to communicate with her friends, play cards, go to church, do light housework at her own pace, cook a couple times a week, care for her personal needs most of the time, go to Bible study, drive sometimes, watch television, go fishing, do some laundry, feed her cat and change its litter box, and sometimes do prison ministry with her father. (Tr. 28). For this reason, the ALJ concluded that at most Engle was mildly limited by her mental condition in her ability to perform activities

of daily living, maintain social functioning, and sustain concentration, persistence, or pace. (Tr. 28). The ALJ also noted that there was no evidence that she experienced any episodes of decompensation for an extended duration. (Tr. 28).

The ALJ then stated that the record was devoid of medical evidence or a "convincing medical opinion" to support a finding that the claimant had any severe impairments or to fully corroborate her subjective complaints. (Tr. 28). The state agency physicians concluded that Sullivan did not have any severe physical impairments. (Tr. 28). The ALJ also pointed to a report prepared by a physician who examined Engle at the request of the Social Security Administration in April 2011, Dr. Onamusi, which stated that Engle was able to engage in gainful employment and did not provide any specific limitations. (Tr. 28). Even Engle's own treating physician, Dr. King, did not state that Engle was limited significantly in her ability to perform basic work-related activities. (Tr. 28).

With regard to her physical problems, Engle complained of bilateral foot pain and chest pain to Dr. King in 2010. (Tr. 28). She was given Mobic and told to stretch her feet and use heel pads. (Tr. 28). She also received Cortisone injections in both heels. (Tr. 28). She did not regularly complain about her feet after 2010. (Tr. 28). The ALJ also noted that there was no "convincing evidence" of record that Engle had severe heart problems. (Tr. 28). A cardiac catheterization and a stress echocardiogram done in 2009 were within normal limits. (Tr. 28). Engle also complained of back, hip, and leg pain to Dr. King, and sought emergency room treatment for her right hip, lower back, and inguinal area pain in July 2011. (Tr. 29). Dr. King thought that Engle's symptoms were consistent with fibromyalgia. (Tr. 29). She had taken Lyrica, Neurontin, Ibuprofen, Vicodin, and a Medrom dose pack for her pain. (Tr. 29). She also

saw a physician in January 2011 for an ovarian cyst, irritable bowel symptoms, and a fast heart rate. (Tr. 29).

The ALJ concluded that Engle's "physical examination findings since the alleged onset date have generally been unremarkable, except for being overweight (approximately 187 pounds) and tenderness in her SI regions." (Tr. 29). Engle's blood pressure almost always was within normal limits, and she did not take any antihypertensive medications. (Tr. 29). The x-rays of her left hip, sacrum, and coccyx were all negative. (Tr. 29). In September 2011, she had blood tests that revealed that her ANA, HLA-B27, sedimentation rate, uric acid level, and RA factor were all either negative or normal. (Tr. 29). She also reported that Lyrica was helping her pain level. (Tr. 29). Two months later, Dr. King noted that Engle was doing well and that her pain had improved markedly. (Tr. 29). This report came within twelve months of her alleged disability onset date. (Tr. 29). The ALJ also noted that there was no evidence that Engle exhibited any muscle atrophy, reflex or sensation abnormalities, or motor strength deficits since her alleged onset date. (Tr. 29).

The ALJ then addressed Engle's mental condition, first noting that the state agency psychologists concluded that Engle did not have any severe mental impairments. (Tr. 29). Dr. Kay Roy, Engle's treating psychologist, stated that Engle was not able to perform a three-step command, she had no useful ability to work with or near others without being unduly distracted, she could not get along with co-workers or peers without distracting them, and she exhibited behavioral extremes. (Tr. 29). She would not be aware of normal hazards and could not deal with the stress of semi-skilled or skilled work. (Tr. 29). Dr. Roy concluded that Engle was unable to meet competitive standards with regard to her ability to maintain attention for two-hour segments, maintain regular attendance and be punctual, complete a normal workday or

workweek without interruption from psychologically-based symptoms, perform at a consistent pace, respond appropriately to changes in a routine work setting, deal with normal work stress, set realistic goals, make plans independently of others, interact appropriately with the general public, maintain socially appropriate behavior, or travel in unfamiliar places. (Tr. 29). She further stated that Engle was limited in her ability to understand, remember, and carry out short and simple instructions, remember work-like procedures, sustain an ordinary routine without special supervision, make simple work-related decisions, and use public transportation. (Tr. 29). She concluded that Engle would be a danger to herself and others in a workplace because of her lack of attention and the likelihood that she would be absent more than four times a month. (Tr. 29).

The ALJ stated that he assigned greater weight to the state agency psychologists' opinion than to Dr. Roy's opinion or Sullivan's allegations. (Tr. 29). The ALJ explained that the state agency psychologists' opinion was most consistent with Engle's activities and the objective medical evidence of record. (Tr. 29). There was no evidence of record that Engle required inpatient psychiatric treatment, and she denied feeling suicidal or homicidal since January 2011. (Tr. 30).

Engle had reported to Dr. King that she was experiencing anxiety and panic attacks in January 2011. (Tr. 30). She was prescribed Celexa and Xanax and referred to the Bowen Center for counseling. (Tr. 30). The following month, she reported improvement in her shakiness and panic attacks. (Tr. 30). Dr. King reported that Engle felt well, her mood was excellent, and she was not having panic attacks. (Tr. 30). In July 2011, Dr. King noted that Engel was alert, and in December 2011, he stated that Engle was doing well and that her depression and panic attacks were under good control. (Tr. 30). In April 2012, Dr. King stated that Engel's mood was under

good control with Celexa and that Xanax controlled her anxiety and kept her from having panic attacks. (Tr. 30).

The ALJ then discussed Engle's visits with other medical sources and noted that the visits were unremarkable. (Tr. 30). Dr. B.T. Onamusi noted that Engle was groomed fairly, alert and oriented, exhibited coherent speech, and had unimpaired memory, rational thought processes, and satisfactory attention span. (Tr. 30). Dr. Ryan Oetting examined Engle in April 2011 at the request of the Social Security Administration, and his mental status examination returned normal results except that Engle exhibited a shaky voice, anxious mood and affect, she had difficulty with serial 7's, and talked excessively. (Tr. 30). In July 2011, emergency room personnel noted that Engle was alert and oriented, responded to commands, and her speech was clear. (Tr. 30).

The ALJ then noted that the progress notes prepared by Dr. Roy and the Bowen Center indicated that Engle complained mainly of family relationship problems, health problems, and difficulties in her women's group, as well as a history of physical and sexual abuse. (Tr. 30). She had been diagnosed with panic attacks without agoraphobia and PTSD. (Tr. 30). Dr. Roy noted that Engel's medications made her drowsy, that she worked at a 5th grade academic level, that her intelligence ranged from borderline to low-average, and that her abnormal mental status examination findings included the inability to repeat three words, inability to do serial 7's, difficulty with similarities and differences, abnormal affect, and disorientation. (Tr. 30). The progress notes from the Bowen Center reflected that Engle's mental status examination findings were unremarkable except for occasional reports that she was restless or anxious. (Tr. 30). She rarely complained of difficulty focusing or concentrating and rarely reported panic attacks to Dr. Roy except in November 2011, when she stated that she almost had a panic attack. (Tr. 30). The ALJ concluded that there was no convincing evidence of record to corroborate Engel's

subjective complaints of frequent panic attacks and significant difficulty concentrating and focusing, especially for a period of twelve consecutive months.  (Tr. 30).

Engle alleges that the ALJ overlooked substantial medical evidence related to her mental impairment.  She complains that she suffered from Post-Traumatic Stress Disorder (PTSD), panic disorder without agoraphobia, and fibromyalgia.  When she saw Dr. Roy in January 2012, her Global Assessment of Function (GAF) score was 41, and the highest it had been in the past year was 43.  Engle was working on her problems with sleep disturbances, improving communications, and building and maintaining healthy relationships.  During her mental status examination, she was unable to repeat three words after a short period of time, had an orientation problem, was unable to perform serial 7's, and could not perform a three-step command.  Her judgment and insight were adequate, but Dr. Roy found some problems with her memory and concentration skills.  Dr. Roy determined that Engle had decreased energy, blunt, flat, or inappropriate affect, generalized persistent anxiety, difficulty thinking or concentrating, recurrent and intrusive recollections of a traumatic experience, persistent disturbances of mood or affect, apprehensive expectation, disorientation to time, easy distractibility, memory impairment, and sleep disturbance.  Dr. Roy found that Engle's mental abilities included "no useful ability to function in the following areas":  work in coordination or proximity to others without being distracted or get along with co-workers or peers without distracting them or exhibiting behavioral extremes.  Dr. Roy determined that Engle was unable to meet competitive standards because she could not pay attention for two hour segments, maintain regular attendance, complete a normal workday without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number of rest periods, respond appropriately to changes in a work routine, and deal with normal work stress.  Over the course of

her treatment, Dr. Roy often noted that Engle was in moderate distress and had an anxious affect. She often found that Engel was stable and noted the particular family and relationship problems.

Engle also pointed to Dr. King's treatment notes. Engle was prescribed Cymbalta at her first appointment and told to seek counseling. She returned to Dr. King, and he believed that she was markedly better because she no longer was crying, was focused better at work, and was not obsessed with issues out of her control. In December 2009, she told Dr. King that she was having anxiety attacks that resulted in occasional dizziness, tight chest, and blurred vision. She already had a full cardiac work-up that was normal. In January 2011, she was seen for increasing stress and anxiety. She had started counseling for her panic attacks. Dr. King diagnosed her with generalized anxiety disorder with panic attacks and started her on Celexa 40 mg again and Xanax. A month later, it was noted that she remained anxious but did not have any further panic attacks since starting Celexa and Xanax. She reported that she went one week without shakiness after she began the Xanax and that she believed her medications had been extremely helpful. In June 2011, she stated that her mood was excellent and that she continued counseling. In December 2011, Dr. King noted that her depression, panic attacks, and fibromyalgia were under control. In April 2012, she also reported that her mood had been under good control from a depressive standpoint with Celexa and Xanax for anxiety, which kept her from having panic attacks.

Engle then discussed Dr. Oetting's observations. He noted that her voice was shaky, she talked excessively, and she provided unnecessary detail. However, her thought processes were logical and her communication mainly was on task. Dr. Oetting thought that Engle was in the low average range of intellectual functioning. Engle also pointed to her performance during her mental functioning test and reports of activities of daily living. She reported experiencing panic

attacks one to three times a week and said that her panic attacks kept her from being employed or partaking in activities, her motivation level was adequate, she had feelings of emptiness and often felt overwhelmed, had difficulty concentrating, was restless, and paced in her home. Dr. Oetting determined that Engle had panic disorder and that her stress level had lowered without the stress of being employed. He stated that Engle had spent many years masking emotional pain with drugs and alcohol and had yet to work through repressed emotions from a dysfunctional childhood. He found that psychosomatic factors seemed to affect her physical functioning level and that excessive apprehension of fear had impaired her ability to carry out routine activities at times. He diagnosed her with panic disorder without agoraphobia and assigned her a GAF score of 58. He also noted that she was capable of managing her own funds.

Engle acknowledged that the state agency physicians' notes were unremarkable. Dr. Onamusi diagnosed her with anxiety/panic disorder and stated that considering her physical conditions only, she should be able to engage in gainful employment. Dr. Sands found that Engle had mild limitations in her activities of daily living, no limitations in maintaining social functioning, concentration, persistence, or pace, and had no repeated episodes of decompensation. She had a GAF score of 58 and no issues with hygiene chores, or social gatherings. Dr. Horton affirmed this assessment.

Engle filed her Opening Brief with this court on June 30, 2014, arguing that the ALJ erred in finding no severe mental impairments, improperly evaluated the opinion evidence of Dr. Kay Roy, Engle's treating psychologist, and improperly evaluated the credibility of Engle's symptom testimony.

*Discussion*

The standard of judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. **42 U.S.C. § 405(g)** ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); ***Schmidt v. Barnhart***, 395 F.3d 737, 744 (7th Cir. 2005); ***Lopez ex rel Lopez v. Barnhart***, 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." ***Richardson v. Perales***, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 852 (1972) (quoting ***Consol. Edison Co. v. NLRB***, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 2d 140 (1938)); *see* ***Jens v. Barnhart***, 347 F.3d 209, 212 (7th Cir. 2003) (stating same); ***Sims v. Barnhart***, 309 F.3d 424, 428 (7th Cir. 2002) (stating same). An ALJ's decision must be affirmed if his findings are supported by substantial evidence and if there have been no errors of law. ***Rice v. Barnhart***, 384 F.3d 363, 368–69 (7th Cir. 2004); ***Scott v. Barnhart***, 297 F.3d 589, 593 (7th Cir. 2002). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." ***Lopez***, 336 F.3d at 539. At a minimum, an ALJ must articulate his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. ***Scott***, 297 F.3d at 595 (7th Cir. 2002); ***Diaz v. Chater***, 55 F.3d 300, 307 (7th Cir. 1995); ***Green v. Shalala***, 51 F.3d 96, 101 (7th Cir. 1995). The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits." ***Zurawski v. Halter***, 245 F.3d 881, 888 (7th Cir. 2001). The ALJ must build an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we

may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." ***Young v. Barnhart***, 362 F.3d 995, 1002 (7th Cir. 2004) (quoting ***Scott***, 297 F.3d at 595); *see* ***Hickman v. Apfel***, 187 F.3d 683, 689 (7th Cir. 1999) (citing ***Sarchet v. Chater***, 78 F.3d 305, 307 (7th Cir. 1996)) (same).

Disability insurance benefits and supplemental security income are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that she is unable

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

**42 U.S.C. § 423(d)(1)(A)**. The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. **20 C.F.R. § 404.1520**. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." **20 C.F.R. § 404.1520(b)**. If she is, the claimant is not disabled and the evaluation process is over. If she is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities." **20 C.F.R. § 404.1520(c)**. Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. **20 C.F.R. § 401, pt. 404, subpt. P, app. 1**. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ next reviews the claimant's "residual functional capacity" (RFC) and the physical and mental demands of her past work. If, at this fourth step, the claimant can perform her past relevant work, she is not disabled. **20 C.F.R. § 404.1520(e)**. However, if the claimant shows that her impairment is so severe that

she is unable to engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of her age, education, job experience, and functional capacity to work, is capable of performing other work and that such work exists in the national economy. **42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f), § 416.920(f).**

Engle argues that the ALJ erred because he did not find that she suffered from a severe mental impairment. Specifically, Engle believes that the ALJ placed too much weight on her activities of daily living and did not show how they translated into the ability to do full-time work. Engle points to her testimony that she shook for entire days without being able to concentrate and could not do anything on those days. She stated that on a good day she only shook for 2 to 3 hours, and that she could do housework, grocery shop, pay bills, do laundry, cook, and do ministry with her sister and father. However, on bad days, her husband had to perform such tasks for her. Engle's sister also reported that Engle's ability to perform activities of daily living depended on her mental state. In rendering this decision, Engle complains that the ALJ also improperly evaluated the opinion of Dr. Roy and her credibility.

Because Engle's complaints stem from her testimony regarding her daily activities, the court will begin by assessing the ALJ's credibility determination. This court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record. *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013); *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed."). The ALJ's "unique position to observe a witness" entitles his opinion to great deference. *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997); *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006). However, if the ALJ does not make explicit

findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). Further, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000); *see Bates*, 736 F.3d at 1098 (indicating that appellate courts have greater leeway to evaluate an ALJ's determination when a credibility finding is based on "objective factors or fundamental implausibilities").

The ALJ must determine a claimant's credibility only after considering all of the claimant's "symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." **20 C.F.R. §404.1529(a);** *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir.2007) ("[S]ubjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004). If the claimant's impairments reasonably could produce the symptoms of which the claimant is complaining, the ALJ must evaluate the intensity and persistence of the claimant's symptoms through consideration of the claimant's "medical history, the medical signs and laboratory findings, and statements from [the claimant, the claimant's] treating or examining physician or psychologist, or other persons about how [the claimant's] symptoms affect [the claimant]." **20 C.F.R. §404.1529(c);** *Moore v. Colvin*, 743 F.3d 1118, 1122–23 (7th Cir. 2014); *Schmidt v. Barnhart*, 395 F.3d 737, 746–47 (7th Cir. 2005) ("These regulations and cases, taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from merely ignoring the testimony or relying solely on a conflict

between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding.").

Although a claimant's complaints of pain cannot be totally unsupported by the medical evidence, the ALJ may not make a credibility determination "solely on the basis of objective medical evidence." **SSR 96-7p, at \*1**; *see Moore*, 743 F.3d at 1125; ***Indoranto v. Barnhart***, 374 F.3d 470, 474 (7th Cir. 2004); ***Carradine v. Barnhart***, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits."). Rather, if the

> [c]laimant indicates that pain is a significant factor of his or her alleged inability to work, the ALJ must obtain detailed descriptions of the claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant. She must investigate all avenues presented that relate to pain, including claimant's prior work record, information and observations by treating physicians, examining physicians, and third parties. Factors that must be considered include the nature and intensity of the claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for relief of pain, functional restrictions, and the claimant's daily activities. (internal citations omitted).

***Luna v. Shalala***, 22 F.3d 687, 691 (7th Cir. 1994); *see **Zurawski v. Halter***, 245 F.3d 881, 887–88 (7th Cir. 2001) (citing ***Luna***).

The ALJ explained that Engle engaged in many social activities and independently performed activities of daily living. However, Engle testified that her activities of daily living were limited by her mental health, including panic attacks, shakiness, and anxiety. The ALJ acknowledged that Engle complained that she had bad days where she was unable to perform these tasks but explained that the medical evidence suggested otherwise. Engle reported vast improvement, and Dr. King noted that after commencing medication and counseling Engle was in a good mood, that the medications relieved her shakiness, and that she no longer had panic

attacks.  The ALJ also pointed out that the record did not include any episodes of decompensation and that Engle did not receive any in-patient psychiatric treatment.  The ALJ further noted that Engle performed within a normal range during her mental status examination with Dr. Oetting.

The record reflects that the ALJ considered the relevant factors as permitted, including Engle's activities of daily living, her reports to her doctors, her performance during the mental health examination, and the notes of both her treating physicians and the state agency doctors, and that the majority of the evidence, except for Dr. Roy's opinion, supported his decision to discount Engle's testimony.

Engle has not demonstrated that the ALJ's decision was patently incorrect.  Although the ALJ did place great emphasis on Engle's activities of daily living, this was one factor, among many, that the ALJ was permitted to consider.  This was not a matter of the ALJ concluding that because Engle periodically engaged in such activities at her leisure that she was able to perform full-time work.  *See* ***Carradine v. Barnhart***, 360 F.3d 751, 755 (7th Cir. 2004) (explaining that the ALJ cannot rely solely on the claimant's activities to support a conclusion that she is not disabled without showing how they translate to the ability to perform full-time work); *see also* ***Hughes v. Astrue***, 705 F.3d 276, 278–79 (7th Cir. 2013) (indicating that the ALJ must recognize the differences between daily living activities and the activities of a full-time job); ***Roddy v. Astrue***, 705 F.3d 631, 639 (7th Cir. 2013) (stating that the ability to perform daily activities does not necessarily translate to an ability to work full-time).  Here, the ALJ also relied on the lack of corroborating medical evidence, the opinions of other physicians, and the noted progress of Engle's mental health treatment to support his conclusion.

In response, Engle argues that the ALJ failed to assign the appropriate weight to Dr. Roy

her treating psychologist. Dr. Roy stated that Engle would miss more than four days a month

and would have significant problems with concentration and attention, including the inability to

maintain attention for a two-hour segment.

Dr. Roy was Engle's treating psychologist. A treating source's opinion is entitled to

controlling weight if the "opinion on the issue(s) of the nature and severity of [the claimant's]

impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with the other substantial evidence" in the record. **20 C.F.R. §**

**404.1527(d)(2)**; *see Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013); ***Punzio v. Astrue***, 630

F.3d 704, 710 (7th Cir. 2011); ***Schmidt v. Astrue***, 496 F.3d 833, 842 (7th Cir. 2007). The ALJ

must "minimally articulate his reasons for crediting or rejecting evidence of disability." ***Clifford***

***v. Apfel***, 227 F.3d 863, 870 (7th Cir. 2000) (quoting ***Scivally v. Sullivan***, 966 F.2d 1070, 1076

(7th Cir. 1992)); *see* **20 C.F.R. § 404.1527(d)(2)** ("We will always give good reasons in our

notice of determination or decision for the weight we give your treating source's opinion.").

"[O]nce well-supported contradicting evidence is introduced, the treating physician's

evidence is no longer entitled to controlling weight' and becomes just one more piece of

evidence for the ALJ to consider." ***Bates***, 736 F.3d at 1100. Controlling weight need not be

given when a physician's opinions are inconsistent with her treatment notes or are contradicted

by substantial evidence in the record, including the claimant's own testimony. ***Schmidt***, 496

F.3d at 842 ("An ALJ thus may discount a treating physician's medical opinion if the opinion is

inconsistent with the opinion of a consulting physician or when the treating physician's opinion

is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting

evidence of disability."); *see, e.g.*, ***Latkowski v. Barnhart***, 93 Fed. Appx. 963, 970–71 (7th Cir.

2004); ***Jacoby v. Barnhart***, 93 Fed. Appx. 939, 942 (7th Cir. 2004). If the ALJ was unable to discern the basis for the treating physician's determination, the ALJ must solicit additional information. ***Moore v. Colvin***, 743 F.3d 1118, 1127 (7th Cir. 2014) (citing ***Similia v. Astrue***, 573 F.3d 503, 514 (7th Cir. 2009)). Ultimately, the weight accorded a treating physician's opinion must balance all the circumstances, with recognition that, while a treating physician "has spent more time with the claimant," the treating physician also may "bend over backwards to assist a patient in obtaining benefits . . . [and] is often not a specialist in the patient's ailments, as the other physicians who give evidence in a disability case usually are." ***Hofslien v. Barnhart***, 439 F.3d 375, 377 (7th Cir. 2006) (internal citations omitted); *see **Punzio***, 630 F.3d at 713.

In his opinion, the ALJ discounted Dr. Roy's opinion regarding Engle's limitations. Dr. Roy filled out a checkbox form indicating Engle's limitations as she perceived them to be. Although she was Engle's treating psychologist, and her opinion was entitled to great weight, the ALJ identified a myriad of alternative evidence that contradicted Dr. Roy's opinion. To begin, Engle saw another treating physician, Dr. King, who prescribed medications for Engle's mental health condition. After reporting anxiety and panic attacks to Dr. King, Engle began counseling at the Bowen Center and was started on Celexa and Xanax. She later reported improvements in her shakiness and panic attacks. The notes from her June 2011 visit reflect that her mood was excellent and that she was not having any panic attacks. In December 2011, Dr. King also noted that Engle's depression and panic attacks were under control, and he later stated that her mood was under good control with Celexa and that Xanax controlled her anxiety and kept her from having panic attacks. Engle's reports to Dr. King and Dr. King's notes recording Engle's mental health status reveal that Engle's mental health condition improved to a point where her depression and panic attacks were under control. This does not support Dr. Roy's opinion that

Engle's depression was so severe as to exclude her from gainful employment. Engle is asking the court to reject the ALJ's opinion because he favored one treating physician's opinion over the opinion of the treating physician whose opinion she desired for the ALJ to adopt. It is not the court's duty to re-weigh evidence. The ALJ has supported his decision with substantial evidence.

It was not only Dr. King's medical notes on which the ALJ relied to discount Dr. Roy. After discussing the mental status examination Dr. Roy conducted, which recorded that Engle could not repeat three words after a short period of time, could not perform serial 7's, and was disoriented with a date, the ALJ explained that Dr. Oetting performed a similar mental status examination and found Engle to be within a normal range. During her examination, Engle could not perform serial 7's, but she did count backward from 20 by 3's and 1's with only one mistake and could do simple addition and subtraction in word problems. She also was oriented to time, place, and date, and she was able to complete all of her basic instrumental activities of daily living independently.

Engle complains that the ALJ overlooked many aspects of Dr. Roy's evaluation. Specifically, she noted sleep disturbances, the inability to repeat three words after a short period of time, difficulty with orientation with a date, inability to perform serial 7's, a history of physical abuse, acute distress with agitation, feelings of being overwhelmed, tired, angry, and hurt, and nervousness. The ALJ did mention many of these notes in his opinion, and the record is clear that he considered Dr. Roy's notes and opinion in their entirety. The ALJ stated that Engle had a history of physical and sexual abuse, including a diagnosis of PTSD, that she worked at a 5th grade level and had borderline to low-average intelligence, that she could not repeat three words at her mental status examination, could not do serial 7's, had difficulty with

similarities and differences, had an abnormal affect, and was disoriented. (Tr. 30). The ALJ also noted that Dr. Roy believed that Engle could not complete a normal workday without interruption from her psychological symptoms, could not perform at a consistent pace, could not maintain regular attendance and be punctual, could not deal with normal work place stress, and could not maintain socially appropriate behavior. (Tr. 29). Dr. Roy also stated that Engle would be a danger to herself and others because of her inability to pay attention for sufficient periods of time. (Tr. 29). Her medications also made her drowsy. (Tr. 30).

Engle complains that the ALJ cherry-picked the evidence because many of Dr. Roy's notes support a finding of PTSD. Specifically, Dr. Roy diagnosed her with this and noted sleep disturbances, orientation problems, agitation, anger, tiredness, anger, hurt, and nervousness all of which are consistent with PTSD. However, the ALJ did not overlook any aspects of Dr. Roy's opinion. Rather, the record reflects that the ALJ considered Dr. Roy's opinions but found that the rest of the record did not support such a finding of a debilitating mental health condition lasting at least 12 months. The ALJ thoroughly explained that Engle's condition improved and was well managed with her medications, that her other treating physician, Dr. King, did not provide for such restrictions, that Engle performed within a normal range at her mental status examination with Dr. Oetting, and that her activities of daily living were inconsistent with Dr. Roy's opinion and a finding of disability. Although Engle complains that she was limited in her activities of daily living on "bad days," her medications and treatment relieved the symptoms, such as shakiness, anxiety, and panic attacks, to which Engle testified limited her activities. It is not the duty of the court to re-weigh the evidence. Rather, the court must consider whether the ALJ supported his decision with substantial evidence, and here the ALJ had great support for his conclusion and thoroughly explained his reasoning.

Based on the foregoing reasons, the decision of the Commissioner is **AFFIRMED**.

ENTERED this 9th day of December, 2014.

/s/ Andrew P. Rodovich
United States Magistrate Judge